IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.  12-cv-02876-RBJ-CBS

ERNEST SELHIME,
     Plaintiff,
v.

ERIC C. CARLSON, Medical Doctor,
JACOB F. PATTERSON, Medical Doctor,
DANNY ENGLUND[1], Physician's Assistant,
ROYAL HAVENS, Physician's Assistant,
SUSAN M. TIONA, Medical Doctor,
MARY GRIEB, Registered Nurse,
MARK WIENPAHL, Medical Doctor,
NOVA WALKER, Registered Nurse,
K.K. Unknwn Name, Nurse Initials, and
ST. THOMAS MORE HOSPITAL,
     Defendants.

---

## RECOMMENDATION ON PENDING DISPOSITIVE MOTIONS

---

Magistrate Judge Shaffer

     Pending before this court are several dispositive motions filed in this action.  On April 8, 2013,

Defendant St. Thomas More Hospital filed a Fed. R. Civ. P. 12(b)(6) Motion to Dismiss (doc. #32).

Defendants Mary Grieb, Mark Wienpahl and Nova Walker filed a Motion to Dismiss (doc. #39) on May

6, 2013.  Defendants Danny Englund and Roy Havens filed their Motion to Dismiss (doc. #55) on June

17, 2013.  A Motion to Dismiss (doc #62) was filed on behalf of Dr. Eric Carlson on July 11, 2013, while

Drs. Jacob Patterson and Susan Tiona filed their Motion to Dismiss (doc. #64) on July 16, 2013.

     On June 4, 2013, Ernest Selhime, the *pro se* Plaintiff, filed a Response (doc. #48) to the Motion

---

[1]For purposes of this Recommendation, the court has presumed that individual Defendants' names are correctly spelled on medical records they authored, or are correctly spelled in motions to dismiss filed on their behalf.  Accordingly, this Recommendation refers to Defendant "Danny Englund" and Defendant "Mark Wienpahl."

submitted on behalf of Defendants Grieb, Wienpahl and Walker.  Mr. Selhime filed his Reply to Motion to Dismiss (doc. #61) filed by Defendant St. Thomas More Hospital on July 10, 2013.  Plaintiff filed a Reply to Defendants [England and Haven's] Motion to Dismiss (doc. #69) on July 19, 2013.  On July 12, 2013, this court directed Mr. Selhime to file a response to Defendant Carlson's Motion on or before August 9, 2013.  By Order dated July 17, 2013, Mr. Selhime was required to respond to Drs. Patterson and Tiona's Motion on or before August 16, 2013.  As of the date of this Recommendation, Mr. Selhime had not responded to either of these Motions.  Defendants Englund and Havens and St. Thomas More Hospital filed reply briefs (doc. #70 and #71) on July 22, 2013 and July 24, 2013, respectively.

On April 10, 2013, this matter was referred to the Magistrate Judge to, *inter alia*, "conduct hearings . . . and submit proposed findings of fact and recommendations for rulings on dispositive motions."  By separate memoranda, each of the pending Motions has been referred to this court for recommendation.  I have carefully reviewed the Motions and all related briefing, the entire court file, and the applicable case law.  For the following reasons, I recommend that Defendants' Motions be granted.

## PROCEDURAL BACKGROUND

Mr. Selhime commenced this action on October 31, 2012 with the filing of his original *pro se* Complaint (doc. #1) against Dr. Carlson, Dr. Patterson, Physician's Assistant Englund, Physician's Assistant Havens, Dr. Tiona, Nurse Grieb, Dr. Wienpahl, Nurse Walker, "Unknown Name Nurse Initials K.K.," Nurse Bufmack, and St. Thomas More Hospital.  On December 27, 2012, Magistrate Judge Boland directed Mr. Selhime to file an amended complaint, after concluding that Plaintiff had failed to indicate how putative Defendant Bufmack had participated in any deprivation of a constitutional or federal right.[2] On February 22, 2013, Mr. Selhime filed the Amended Complaint (doc. #20) that remains the operative pleading in this case.  The Amended Complaint asserts two claims for relief.  The First Claim, brought

---

[2]Mr. Selhime did not renew his claims against Jody Bufmack.

pursuant to 42 U.S.C. § 1983, alleges that each of the individual Defendants were deliberately indifferent to a serious medical condition, thereby violating Plaintiff's Eighth Amendment right to be free from cruel and unusual punishment.  The Second Claim asserts a "violation of C.R.S. § 13-21-111.5" based upon a conspiracy by Defendants Walker, Tiona and Grieb to "ignore [Plaintiff's] pain and suffering."

In attempting to summarize the relevant facts as presented by Mr. Selhime, I have drawn upon the Amended Complaint and the attached medical records.  *Cf. Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009) (in deciding a motion to dismiss, the court assumes "the factual allegations are true and ask[s] whether it is plausible that the plaintiff is entitled to relief") and *Pace v. Swerdlow*, 519 F.3d 1067, 1072 (10th Cir. 2008) (in ruling on a motion to dismiss, the trial court may properly consider exhibits attached to the complaint).  *But see GFF Corp. v. Associated Wholesale Grocers*, 130 F.3d 1381, 1385 (10th Cir.1997) ("[F]actual allegations that contradict ... a properly considered document are not well-pleaded facts that the court must accept as true.").

On October 27, 2011, while incarcerated at Arrowhead Correctional Center in Cañon City, Colorado, Mr. Selhime slipped on the ice and sustained an injury that ultimately was diagnosed as a transverse fracture of his upper right femur.  *See* Amended Complaint, at ¶1.  At the time of his injury, Mr. Selhime was 62 years old and reportedly used "a cane because he has had significant spinal surgeries, 3 different times, following a gunshot wound through his abdomen and lodged in his spine in Vietnam many years ago."  *See* Attachment 1 to the Amended Complaint.  Following his fall, Mr. Selhime was transported to the emergency center at St. Thomas More Hospital and subsequently admitted to the Hospital on October 27, 2011.

The Amended Complaint alleges, and the attached medical records reflect, that on October 28, 2011, Dr. Carlson, assisted by Dr. Patterson, performed orthopedic surgery to repair Mr. Selhime's fractured leg.  *See* Attachment 2 to the Amended Complaint.  The Operative Report states the fracture was reduced with "satisfactory alignment and rotation" as verified both "radiographically and clinically."

3

*Id.*  According to Dr. Carlson's Operative Report, there were "no complications" associated with the surgical procedure.

Dr. Carlson's Discharge Summary indicates that on November 1, 2011, Mr. Selhime was transferred to "rehab status from acute care status and continued with his twice-a-day physical and occupational therapy."  *See* Attachment 3 to the Amended Complaint.  Plaintiff complained of pain on November 5, 2011 after he slightly twisted his knee.  The Discharge Summary notes that

> New x-ray files were done on November 6, 2011, and there is overall satisfactory alignment and fixation in his right hip . . . .  There were no acute changes from the films after his surgery.

*Id.*  The same medical record reflects that as of November 7, 2011, Mr. Selhime had "made good progress with physical therapy" and could walk 150 feet.  Mr. Selhime was told that "he is only to put partial weight on his right lower extremity and he is to have a walker to do that."  The Discharge Summary concludes that "[o]verall, [Mr. Selhime] is improving."

The Amended Complaint alleges that Mr. Selhime was discharged from St. Thomas More Hospital and returned to the custody of the Colorado Department of Corrections.  Plaintiff alleges that Drs. Carlson and/or Patterson gave discharge instructions to Physician's Assistant Englund, who "promptly ignored" those instructions.  *See* Amended Complaint, at ¶4.  The Discharge Summary attached to the Amended Complaint provides more information.

> PLAN: I spoke with Dan England, PA, at the infirmary of DOC who agreed to accept the patient in transfer.  Orthopedic orders will be sent with him.  I would be happy to see him back in the office or he can be followed in the DOC clinic.  He is to have a well-balanced diet.  He must have a properly fitted walker.  He can touch his right foot down only lightly for balance.  Skin staples should be removed on November 14, 2011.  He may get the incision wet and use dressings if necessary.  Right hip x-ray imaging should be rechecked in 3 weeks.

*Id.*

The Amended Complaint goes on to allege that Physician's Assistant Havens learned that Mr. Selhime had "a new spiral fracture of the femur, as well as the unhealed original fracture, but did

nothing." *See* Amended Complaint, at ¶5.  The medical records appended to the Amended Complaint place the foregoing allegation in a fuller context.  Plaintiff's original fracture was x-rayed on November 25, 2011 by Dr. Robert Lile with Rocky Mountain Radiologists, P.C.  Dr. Lile's report acknowledges a "partially healed transverse fracture of the proximal femoral metaphysis," but also noted a suspected "new spiral fracture of the proximal right femur." *See* Attachment 4 to the Amended Complaint.

The Amended Complaint next alleges that in "January" 2012, Plaintiff "declared an emergency because of severe pain in his leg and hip" and was seen by "Nurse Nova" who allegedly said "there was nothing she could do for him, ignored his suffering and sent him back to his unit." *See* Amended Complaint, at ¶6.  Mr. Selhime attached to his Amended Complaint the health record that Defendant Walker signed documenting her contact with Plaintiff on January 3, 2012.  According to Defendant Walker's narrative, Mr. Selhime reported "r/t leg pain" that prevented him from sleeping.  Nurse Walker advised Mr. Selhime that if the reported emergency "is for his chronic pain issues, there isn't much that I will likely be able to do for him, as he already has Tylenol."  However, Nurse Walker also took the opportunity to assess Mr. Selhime's leg, noting that "pedal pulses are present and normal, offender is able to manipulate the leg on his own, but states that he is not supposed to be walking (per the provider)." *See* Attachment 6 to the Amended Complaint.  Defendant Walker concluded her narrative by stating that she "informed [Mr. Selhime] that he will need to place a kite to be seen re his pain issue.  He is agreeable." *Id.*

Two days after seeing Nurse Walker, Mr. Selhime returned the medical unit and was evaluated by Dr. Tiona.  The Amended Complaint alleges that Mr. Selhime told Dr. Tiona that he "was in a great deal of pain," that Dr. Tiona "viewed the x-rays from 11/25/11, and became aware of the new spiral fracture." The Amended Complaint further avers that Defendant Tiona's "answer was to increase pain medication, x-ray the hip again, and refer Selhime back to the surgeon." *See* Amended Complaint, at ¶7.  The health record attached to the Amended Complaint closely tracks Plaintiff's account of Dr. Tiona's examination.

That record describes Mr. Selhime's condition as "morbidly obese" and acknowledges Plaintiff's inability to "lift right foot off of the wheelchair foot rest – and contraction of the quad muscles causes severe pain." Dr. Tiona ordered that Mr. Selhime's right hip should be x-rayed that day, that his pain prescription be increased, and that Mr. Selhime's medical chart should be returned to her "when x-ray report is available."[3]  *See* Attachment 7 to the Amended Complaint.

The Amended Complaint states that Mr. Selhime continued to experience "constant pain" following this visit with Dr. Tiona.  Plaintiff alleges that he complained of pain between March 12 and 19, 2012, and was seen by Nurse Grieb on March 19, 2012.  The Amended Complaint avers that Defendant Grieb concluded that Mr. Selhime did not have a "'true' emergency," despite the fact that she knew "his x-rays showed that his femur had not rejoined, and he had a 'new fracture.'" Plaintiff alleges that Defendant Grieb told him to "continue 'ambulating' even though there was a new untreated fracture." *See* Amended Complaint, at ¶8.

Once again, the corresponding medical record provides additional information regarding Mr. Selhime's interaction with Defendant Grieb on March 19, 2012.  *See* Attachment 8 to the Amended Complaint.  The narrative states that Mr. Selhime "self-declared" his emergency "due to pain in right groin/thigh/shin and frequent bloody noses."  The health record indicates that Mr. Selhime was "seen 3/12 for same issue."  In the "Assessment" portion of the health record, Defendant Grieb noted that Mr. Selhime acknowledged "he does not have true emergency" but wanted to be seen "anyway due to leg pain."[4]  According to the notes she prepared on March 19, 2012, Defendant Grieb examined Mr.

---

[3]The Amended Complaint does not indicate whether an x-ray was taken on January 5, 2012 or within days after Dr. Tiona's examination.  Unfortunately, the medical records attached to the Amended Complaint do not reference an x-ray taken in January 2012.  It does appear that Mr. Selhime's leg was x-rayed in February 2012, at which time there appeared to be "gradual healing" that was "not complete." *See* Attachment 10 to the Amended Complaint.

[4]The court is limited to the factual allegations in the Amended Complaint and the attached medical records.  However, apparently between January 5, 2012 and March 19, 2012, Mr. Selhime's prescription for pain relief was increased to include oxycodone which he was to take "three times daily as needed for

Selhime's leg.  While she found no evidence of infection or swelling, she did suspect "muscle atrophy."

Defendant Grieb "encouraged" Plaintiff "to continue ambulating with assistance 3 times per day to regain

ambulatory abilities, as ordered by Dr. Tiona 3/12/12" and noted that Mr. Selhime should resume physical

therapy "as referral is still good."  *Id.*

The Amended Complaint states that Mr. Selhime saw Defendant Tiona again on May 31, 2012, at

which time she acknowledged that Plaintiff was experiencing persistent pain that was not being addressed

effectively with his current medication, and that his "original and secondary fracture hasn't healed."  *See*

Amended Complaint, at ¶9.  The corresponding medical record reflects Dr. Tiona's assessment that while

Mr. Selhime was continuing to receive physical therapy, his progress was very slow.  Defendant Tiona

concluded that Mr. Selhime "needs to continue on [his] level of pain control for a couple of months so

that he can work on his rehabilitation.  His motivation is very good."  *See* Attachment 9 to the Amended

Complaint.

The Amended Complaint alleges that Plaintiff was seen by Dr. Wienpahl on July 18, 2012,[5] who

"ordered him to do leg exercises when his x-ray showed two fractures, one untreated, not knowing what

effect exercise would have on the new fracture."  *See* Amended Complaint, at ¶11.  The health record

---

pain."  *See* Attachments 7 and 8.

[5]The Amended Complaint also avers in paragraph 10 that Mr. Selhime was seen by a "Nurse K.K." during the July 18, 2012 visit to the medical unit.  A health record apparently signed by Nurse K.K. is appended to the Amended Complaint as Attachment 10.  In that record, Nurse K.K. expresses her belief that Mr. Selhime's main and "very substantial" issue was CHRONIC PAIN AND DISABILITY, R LEG POST FEMUR FX."  In Nurse K.K.'s opinion, the

> obvious problem is lack of physical therapy.  To have had only 4 sessions for such an injury is, well, insufficient in my mind.  There is no way we will resolve his pain without getting the leg more functional.  We will likely spend far more in the future on his med care than we could on PT.  I agree his prognosis is not good for full recovery, but we should try to get him more functional and out of the chair.

*See* Attachment 10 to the Amended Complaint.  Although the Amended Complaint names "Nurse K.K." as a defendant in this action, that individual apparently has never been identified or served with the summons and complaint.

signed by Dr. Wienpahl describes the July 18, 2012 examination in more detail.  At that time, Mr.

Selhime reportedly complained that his "big issue is the leg."  According to Dr. Wienpahl's notes, Mr.

Selhime "feels he is able to walk a bit better since last visit, but the pain is worse and the Percocet is not

helping."

> He can walk an estimated quarter mile (I suspect less) but . . . is walking only every other
> day one direction to medline, and traveling in the wheelchair the rest of the time.  He hurts
> so much in the thigh and groin after the walking that it takes an hour to get back to
> baseline.  He is riding the exercise bike once a week for an hour.  No other exercise or
> ROM. . .  Describes the pain as a burning in the mid to distal ant thigh, worse with
> walking; some of the time it radiates to the calf.  Also a burning, and dull pain in R prox,
> medial thigh/groin.

*See* Attachment 11 to the Amended Complaint.  Dr. Wienpahl ordered "follow up radiographs of R femur,

2 view," and observed that Mr. Selhime "may well need referral to ortho to be sure nothing is being

missed."  On July 18, 2012, Defendant Wienpahl "emphasized to [Mr. Selhime] that we must have him do

ROM and strengthening exercises daily to rehab the leg.  I will try to get an OCA or someone to help him

with this."  Dr. Wienpahl also ordered that Mr. Selhime start taking amitriptyline, based upon Plaintiff's

report that "he tried amitriptyline in past from VA for pain and it helped."  *Id.*

Defendant Wienpahl saw Mr. Selhime again on July 20, 2012.  In referring to that event, the

Amended Complaint states that Dr. Wienpahl reviewed an x-ray, "saw that the leg was not healing and

decided that [Plaintiff] needed bone grafting to more prolonged immobilization, take [Plaintiff] off weight

bearing and drug him for pain."  *See* Amended Complaint, at ¶12.  The Amended Complaint further

alleges that Defendant Wienpahl referred Mr. Selhime "to another orthopedic, Dr. Nakamura, and

converted him to narcotic to long acting [sic]."  *See* Amended Complaint, at ¶14.

Once again, the corresponding medical records provide additional, important details.  In

documenting his July 20, 2012 examination of Mr. Selhime, Dr. Wienpahl wrote:

> Today, radiographs were obtained and altho we await the read, it is obvious to my reading
> that pt has nonunion of the primary subtrochanteric femoral shaft fx that he suffered late
> last Oct.  At this point, I think no amount of further wt bearing will change matters; he is

8

going to need a revision of the fixation, likely with bone grafting and more prolonged immobilization.  I have checked with Dr. Nakamura's office and found that referral there is appropriate.  Therefore, we will take inmate off wt bearing except for transfers, etc, and convert him to long acting oxycodone or morphine.  I have encouraged inmate to try to regain some hip ROM by passively moving his thigh about despite the pain, but he will likely not gain much.

*See* Attachments 12 and 13 to the original Complaint.[6]  Dr. Wienpahl's notes from July 20, 2012 continued:

To recap the hx for this consult request, the inmate suffered transverse subtrochanteric fx R femur on 10/27/11 and had ORIF on 10/28.  On 11/25/11 radiographs, he was found to have complicating additional spiral fracture of the proxto mid-metaphysis of the femur which appears to have involved the crossing screw.  It is not clear to me at this time how the second fx occurred.  Matters at that point were treated conservatively, but, although the spiral fx appears to have healed, the transverse has not.

*See* Attachment 13 to the original Complaint.

Mr. Selhime concludes that Defendants violated his Eighth Amendment rights because they knew of, but ignored his condition.  Plaintiff insists that "[b]ecause of CDOC policy of expense, and being an 'offender in prison' Selhime received improper medical treatment, 'purposely.'"  While Mr. Selhime believes that he should have been placed in traction, he contends that was not done "because that involved 'bed care and expense.'"  *See* Amended Complaint, at ¶16.  Defendants have moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(1)[7] and 12(b)(6).  Although directed to a specific moving party or parties, each of the pending Motions raises the same essential arguments.

## ANALYSIS

Rule 12(b)(6) states that a court may dismiss a complaint for "failure to state a claim upon which

---

[6]*See State Farm Mutual Automobile Insurance Co. v. Boellstorff*, 540 F.3d 1223, 1126 no.7 (10th Cir. 2008) (holding that the court may take judicial notice of documents in the public record, including its own docket); *Vaninetti v. Western Pocahontas Properties, Ltd Partnership*, 2012 WL 4359302, at *2 (D. Colo. Sept. 24, 2012) ("in ruling on a Rule 12(b)(6) motion to dismiss, . . . a court may properly consider facts subject to judicial notice such as court files and matters of public record").

[7]Rule 12(b)(1) empowers a court to dismiss a complaint for lack of jurisdiction over the subject matter.  *See, e.g., American Fair Credit Ass'n v. United Credit Nat. Bank*, 132 F. Supp. 2d 1304, 1308-09 (D. Colo. 2001).  Defendants' Motions do not raise any specific argument under Rule 12(b)(1).

relief can be granted." *See* Fed. R. Civ. P. 12(b)(6).  In deciding a motion under Rule 12(b)(6), the court must "accept as true all well-pleaded factual allegations . . . and view these allegations in the light most favorable to the plaintiff." *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010) (quoting *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009)).  However, a plaintiff may not rely on mere labels or conclusions, "and a formulaic recitation of the elements of a cause of action will not do."  *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

To withstand a motion to dismiss, a complaint must contain enough allegations of fact "to state a claim to relief that is plausible on its face."  *Id.*  As the Tenth Circuit explained in *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007), "the mere metaphysical possibility that *some* plaintiff could prove *some* set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims."  "The burden is on the plaintiff to frame 'a complaint with enough factual matter (taken as true) to suggest' that he or she is entitled to relief."  *Robbins v. Oklahoma,* 519 F.3d 1242, 1247 (10th Cir. 2008) (citation omitted).  A complaint must set forth sufficient facts to elevate a claim above the level of mere speculation.  *Id.*

> The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted.  In doing so, the Court must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff.  However, the Court need not accept conclusory allegations.

> [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not shown-that the pleader is entitled to relief. . . .  The plausibility standard requires that relief must plausibly follow from the facts alleged, not that the facts themselves be plausible.

*Jordan-Arapahoe, LLP v. Board of County Commissioners of the County of Arapahoe*, 2009 WL 2924777, at *2 (D. Colo. Sept. 9, 2009) (internal citations omitted).  The ultimate duty of the court is to "determine whether the complaint sufficiently alleges facts supporting all the elements necessary to

establish an entitlement to relief under the legal theory proposed." *Forest Guardians v. Forsgren*, 478

F.3d 1149, 1160 (10th Cir. 2007).

The court must "read pro se complaints more liberally than those composed by lawyers."

*Firstenberg v. City of Santa Fe, N.M.*, 696 F.3d 1018, 1024 (10th Cir. 2012) (internal quotation marks and

citation omitted). However, "the generous construction" that is afforded *pro se* pleadings has limits, and

the court "must avoid becoming the plaintiff's advocate." *Id.* Although the court does not "hold the pro

se plaintiff to the standard of a trained lawyer," it nonetheless relies on "the plaintiff's statement of his

own cause of action." *Id.* Thus, the court "may not rewrite a [complaint] to include claims that were

never presented." *Id.* A court may not assume that a plaintiff can prove facts that have not been asserted,

or that a defendant has violated laws in ways that a plaintiff has not alleged. *See Whitney v. State of New

Mexico*, 113 F.3d 1170, 1173-74 (10th Cir. 1997) (court may not "supply additional factual allegations to

round out a plaintiff's complaint"); *Drake v. City of Fort Collins*, 927 F.2d 1156, 1159 (10th Cir. 1991)

(the court may not "construct arguments or theories for the plaintiff in the absence of any discussion of

those issues").

A.     *Defendant St. Thomas More Hospital*

Defendant St. Thomas More Hospital challenges Mr. Selhime's First Claim on two grounds. First,

the Hospital argues that it is not a "state actor" for purposes of § 1983. Second, Defendant contends that

Drs. Carlson and Patterson are not employees of St. Thomas More Hospital and, therefore, the Amended

Complaint describes no actions or constitutional violations that can be attributed to St. Thomas More

Hospital. In his response brief, Mr. Selhime reiterates his view that "the defendant Hospital abandoned

Plaintiff in a serious condition, where their employees Dr. Carlson and Dr. Patterson compounded the

injured leg, then released Plaintiff to a 'prison infirmary' where they knew/or should have known he wold

receive inadequate care[.]" *See* Plaintiff's Reply to Motion to Dismiss (doc. #61), at 3.

Section 1983 creates a cause of action where a "person . . . under color of any statute, ordinance,

regulation, custom or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person . . . to the deprivation of any rights, privileges or immunities secured by the Constitution." This statute does not create any substantive rights; rather, it only provides a remedy for violations of rights secured by federal statutory and constitutional law. *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 616-18 (1979). To establish a claim under § 1983, a plaintiff must prove he was deprived of a right secured by the Constitution or laws of the United States and that the alleged deprivation was committed under color of law. *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999).

In this case, it is undisputed that Mr. Selhime was transported to St. Thoms More Hospital's emergency center following his fall on October 27, 2011, and that surgery to repair Plaintiff's transverse fracture was performed at the Hospital by Drs. Carlson and Patterson on the following day. The Amended Complain alleges that "St. Thomas More Hospital is/was under contract to perform surgery for CDOC on Plaintiff and other inmates[.]" Mr. Selhime further presumes that Drs. Carlson and Patterson either directly "and/or through St. Thomas More contracted with . . . CDOC to give medical care to plaintiff." Notably, the foregoing allegations appear in the "Parties" section of the Amended Complaint. However,

> A hospital is in a unique position. Many of its services are performed by salaried employees. Many others are performed by physicians. These physicians may or may not be independent contractors, residents, interns, etc.

*Morrison v. Washington County, Alabama*, 700 F.2d 678, 682 (11th Cir. 1983).

As the Supreme Court explained in *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 936 (1982), the conduct allegedly causing the deprivation of a federal right must be "fairly attributable to the State."

> First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible. . . . Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor. This may be because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his

conduct is otherwise chargeable to the State.

*Id.* In *West v. Atkins*, 487 U.S. 42, 54 (1988), the Supreme Court held that a private physician under

contract with a state to provide medical services to prison inmates was acting under color of state law

when treating a prisoner.[8]  Similarly, the Tenth Circuit has held that a medical center and the individual

doctors actually employed by that facility may be liable under § 1983 for an Eighth Amendment violation

"because the [medical center] contracted with the State of Oklahoma to provide medical care to state

prisoners." *Parker v. Gosmanova*, 335 F. App'x 791, 794 (10th Cir. 2009).  *But compare Connor v.*

*Donnelly*, 42 F.3d 220, 223 (4th Cir. 1994) (holding that a physician acted under color of state law when

treating a prisoner even though there was no contractual relationship between the prison and the

physician) and *Dixon v. Baptist South Medical Hospital*, 2010 WL 431186, at *7 (M.D. Ala. Feb. 1.

2010) (noting that "[t]he vast majority of federal courts agree that treatment by a non-contract private

physician, nurse or hospital upon referral or on an emergency basis does not satisfy the requirements for

state action").

In applying the "color of state law" element under § 1983, the court's analysis turns on "the

relationship among the State, the physician, and the prisoner." *West*, 487 U.S. at 56.  That relationship, in

turn, depends upon the specific facts and circumstances of each case.  *See, e.g., Styles v. McGinnis*, 28 F.

App'x 362, 364 (6th Cir. 2001) (holding that the defendant physician did not qualify as a state actor under

§ 1983 where he had no contractual relationship with the state, either through the Michigan Department

of Corrections or the hospital, but rather provided emergency staffing services to the hospital as an

---

[8]The defendant physician in *West* had a "Professional Services" contract with the State of North
Carolina, under which he was paid approximately $52,000 annually to operate two orthopedic clinics each
week at Central Prison Hospital, and additional amounts for surgery.  It further appears that the defendant
physician was contractually obligated to comply with the state's Manual governing prison health care in
state institutions.  *West*, 487 U.S. at 44 and 51.  However, the Supreme Court also noted that "the fact that
private entities receive funding and were subject to state regulation did not, without more, convert their
conduct into state action."  *Id.* at 52.

independent contractor); *Nunez v. Horn*, 72 F. Supp. 2d 24, 27 (N.D.N.Y. 1999) (orthopedic surgeon who performed surgery at private hospital on inmate pursuant to referral but absent contract with Bureau of Prisons was not a state actor). Unfortunately, in this case, Mr. Selhime's Amended Complaint is devoid of any facts that shed light on the relationship between the Colorado Department of Corrections ("CDOC"), St. Thomas More Hospital, and Drs. Carlson and Patterson. The Hospital insists that it is a "private nonprofit corporation" that does not employ Defendant Carlson or Defendant Patterson. Mr. Selhime's Amended Complaint appears to assume, without providing supporting facts, that Drs. Carlson and Patterson contracted independently with the Department of Corrections, or contracted with CDOC through St. Thomas More Hospital. *But see Hall v. Witteman*, 584 F.3d 859, 863 (10th Cir. 2009) (noting that conclusory allegations in a complaint are not entitled to an assumption of truth).

For purposes of the Hospital's pending Motion to Dismiss, however, this court is not required to resolve St. Thomas More Hospital's relationship with Drs. Carlson and Patterson, or decide whether those physicians were "state actors" under § 1983. St. Thomas More Hospital "cannot be liable under § 1983 based on the doctrine of *respondeat superior*." *Parker*, 335 F. App'x at 794-95. Rather, Plaintiff must allege, and ultimately establish, the Hospital's "independent liability based on a wrongful policy or custom." *Id. Cf. Pope v. Carns*, 2009 WL 3614789, at *4 (W.D. Ok. Oct. 28, 2009) (holding that the plaintiff prisoner had failed to establish the defendant hospital's liability in the absence of any wrongful policy or custom, or any constitutional violation by a hospital employee or the two doctor defendants). On close examination, the First and Second Claims in the Amended Complaint are devoid of any reference to St. Thomas More Hospital, much less any factual allegations that would establish the Hospital's independent liability. To properly allege a § 1983 claim against St. Thomas More Hospital, Mr. Selhime cannot simply rely on the fact that his surgical procedure was performed at that facility. Unfortunately, that is the only fact relative to the Defendant Hospital presented in the Amended Complaint. On that basis, the First Claim must be dismissed as to Defendant St. Thomas More Hospital.

B.      *Plaintiff's Eighth Amendment Claim*

The individual Defendants have all moved to dismiss the First Claim, arguing that Mr. Selhime's

conclusory allegations are insufficient to state a claim under the Eighth Amendment.  More specifically,

Defendants contend that the Second Amended Complaint fails to satisfy the subjective prong of the

deliberate indifference standard.  To the contrary, Mr. Selhime insists the "Defendants showed deliberate

indifference in not caring enough to come together and treat [his] injury, instead of countermanding each

others orders while Plaintiff suffered in pain."  *See* Plaintiff's Response to Motion to Dismiss (doc. #48),

at 5.  This court has no doubt that Mr. Selhime experienced ongoing medical difficulties following his

injury on October 27, 2011, and I can appreciate the frustration he must have felt as his condition did not

improve over time.   Unfortunately, the court's empathy cannot substitute for a properly alleged Eighth

Amendment claim and Plaintiff's understandable frustration will not suffice to overcome pleading

deficiencies in the Amended Complaint.

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments."  U.S. Const.

Amend. VIII.  "[T]he treatment a prisoner receives in prison and the conditions under which he is

confined are subject to scrutiny under the Eighth Amendment."  *Farmer v. Brennan*, 511 U.S. 825, 832

(1994) (citation omitted).  The Eighth Amendment prohibits prison officials from being deliberately

indifferent to the serious medical needs of prisoners in their custody.  *See Estelle v. Gamble*, 429 U.S. 97,

104-06 (1976) ("[D]eliberate indifference to serious medical needs of prisoners constitutes the

'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment.") (internal quotation

marks and citation omitted).

An Eighth Amendment claim involves "a two-pronged inquiry, comprised of an objective

component and a subjective component."  *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006).  "Under

the objective inquiry, the alleged condition must be sufficiently serious to constitute a deprivation of

constitutional dimension."  *Id.* (internal quotation marks and citation omitted).  An objectively serious

medical need or condition is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Riddle v. Mondragon*, 83 F.3d 1197, 1202 (10th Cir. 1996).[9]

Where a plaintiff is alleging a delay in medical care, he must show that the alleged delay resulted in substantial harm.

> That "substantial harm" can be the ultimate physical injury caused by the prisoner's illness, so long as the prisoner can show that the more timely receipt of medical treatment would have minimized or prevented the harm. The "substantial harm" can also be an intermediate injury, such as the pain experienced while waiting for treatment and analgesics. Although "not every twinge of pain suffered as a result of delay in medical care is actionable," when the pain suffered during the delay is substantial, the prisoner "sufficiently establishes the objective element of the deliberate indifference test."

*Kikumura v. Osagie*, 461 F.3d 1269, 1292 (10th Cir. 2006) (quoting *Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000)), *overruling on other grounds recognized by Robbins v. Oklahoma*, 519 F.3d 1242 (10th Cir. 2008). For purposes of the instant Motion only, the court will presume that Plaintiff has alleged facts that, if proven, would establish an objectively serious medical need.

Under the subjective inquiry, the defendant must have acted with a "sufficiently culpable state of mind." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). An inmate's complaint of inadequate medical care amounts to an Eighth Amendment claim if the inmate alleges "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 106. To meet the subjective component of an Eighth Amendment claim, a plaintiff must establish the defendant "knew he faced a substantial risk of harm and disregarded that risk, 'by failing to take reasonable measures to abate it.'" *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999) (quoting *Farmer*, 511 U.S. at 847). For a

---

[9]Factors that may be indicative of a serious medical need include "the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain," as well as the "potential for harm if medical care is delayed or denied." *Gutierrez v. Peters*, 111 F.3d 1364, 1373, n. 8 (7th Cir. 1997) (internal quotation marks and citation omitted).

16

prison official to be deliberately indifferent under the Eighth Amendment, "the official must 'know[] of and disregard[] an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must draw the inference.'" *Perkins v. Kansas Dept. of Corrections*, 165 F.3d 803, 809 (10th Cir. 1999) (quoting *Farmer*, 511 U.S. at 837).

The Constitution does not guarantee a prisoner the treatment of his choice. *Ledoux v. Davis,* 961 F.2d at 1537 (citations omitted). *See also Henderson v. Secretary of Corrections*, 518 F.2d 694, 695 (10th Cir. 1975) ("prisoner's right is to medical care not to the type or scope of medical care which he personally desires"). "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishment Clause." *Whitley v. Albers*, 475 U.S. 312, 319 (1986), *abrogated on other grounds by Wilkins v. Gaddy*, 559 U.S. 34 (2010). Deliberate indifference requires a higher degree of fault than negligence or even gross negligence. *Berry v. City of Muskogee, Oklahoma*, 900 F.2d 1489, 1495-96 (10th Cir. 1990) (citation omitted).

> [O]ur case law firmly establishes that "the subjective component is not satisfied, absent an extraordinary degree of neglect, where a doctor merely exercises his considered medical judgment." Examples of such matters "that traditionally fall within the scope of medical judgment are decisions *as whether to consult a specialist* or undertake additional medical testing." A prison doctor does not violate the Eighth Amendment's prohibit on cruel and unusual punishment when he "simply resolves the question whether additional diagnostic techniques or forms of treatment is indicated.

*Heidtke v. Corrections Corporation of America*, 489 F. App'x 275, 280 (10th Cir. 2012) (internal citations omitted; emphasis in original).

It should be noted that the "negligent failure to provide adequate medical care, even one constituting medical malpractice, does not give rise to a constitutional violation." *Self v. Crum*, 439 F.3d at 1233. An Eighth Amendment claim is not asserted "if a prisoner's complaint is directed at the wisdom or quality of the medical care he received in prison, even if that treatment is so negligent as to amount of medical malpractice." *Brinton v. Gaffney*, 554 F. Supp. 388, 389 (E.D. Pa. 1983). *See also Ledoux*, 961

F.2d at 1537 (simple negligence or inadvertent failure to provide adequate medical care does not

constitute the unnecessary and wanton infliction of pain).

When measured against these well-established precedents, it becomes readily apparent that the

Amended Complaint fails to properly assert an Eighth Amendment claim.  While Plaintiff may take

exception to the surgical performance of Drs. Carlson and Patterson, there is nothing in the available

medical records that would suggest those physicians were deliberately indifferent to Plaintiff's injury or

care.  The surgery was performed promptly, and resulted in a reduction that had "satisfactory alignment

and rotation," as verified by x-rays both during and after the procedure.  Within days of his surgery, Mr.

Selhime was "making good progress with physical therapy" and walking 150 feet.  The November 7,

2011 Discharge Summary states that while Mr. Selhime's post-operative condition could be monitored by

the prison clinic, Dr. Carlson "would be happy to see him back in the office."  In short, the medical

records appended to the Amended Complaint fail to suggest that Drs. Carlson and Patterson disregarded

Plaintiff's medical condition or failed to take reasonable measures to abate the risk to Mr. Selhime's

health.  A less-than satisfactory surgical outcome, without more, does not establish liability under the

Eighth Amendment.

Plaintiff's Eighth Amendment claim against Defendants Englund and Havens is based more on

assumption, than fact.  Plaintiff presumes that discharge instructions were given to Defendant Englund,

which he "promptly ignored."  The Discharge Summary does reflect that  PA Englund spoke with one of

Plaintiff's surgeon's (presumably Dr. Carlson) and "agreed to accept [Mr. Selhime] in transfer."  *See*

Attachment 3 to the Amended Complaint.  The Discharge Summary does not state, however, that PA

Englund actually received specific instructions regarding Plaintiff's continued care.  Rather, the

Discharge Summary states that "[o]rthopedic orders will be sent with him."  Nothing in the available

medical records indicates that PA Englund ever saw those orthopedic orders or had contact of any kind

with Plaintiff after he returned to the correctional facility.  While the Discharge Summary directs that Mr.

Selhime should have a "well-balanced diet," the Amended Complaint does not allege that PA Englund had any authority over prison food services or the power to change Mr. Selhime's diet.  If the court credits the allegations in the Amended Complaint and Mr. Selhime's own medical records, Defendant Englund has been sued simply because of a single telephone conversation with Plaintiff's surgeon.[10]  That serendipitous contact is not enough to make out an Eighth Amendment claim.

The single allegation against Defendant Havens is similarly based on assumption, rather than fact.  Plaintiff presumes that PA Havens "viewed the results of . . . new x-rays" and, therefore, "was aware of a new spiral fracture . . . but did nothing."  To the contrary, Dr. Lile's November 25, 2011 x-ray report merely identifies Defendant Havens as the "referring provider."  From that single reference, and without alleging any earlier or subsequent contact with Defendant Havens, Mr. Selhime simply assumes this Defendant received and "ignored" Dr. Lile's findings.  However, Mr. Selhime's assumptions cannot substitute for well-pled facts.

The First Claim is equally deficient as to Defendants Walker, Tiona, Grieb and Wienpahl.  While these medical providers may not have provided treatment that Mr. Selhime considered satisfactory, the medical records provided by Plaintiff do not reflect deliberate indifference on their part.  For example, Mr. Selhime alleges that Defendant Walker "ignored his suffering and sent him back to his unit."  However, Attachment 6 indicates that Defendant Walker assessed Plaintiff's leg and recommended that Mr. Selhime "submit a kite to be seen re his pain issue."  Indeed, two days later, Mr. Selhime was seen by Dr. Tiona for the ongoing pain in his leg.  The medical records show that Dr. Tiona was aware of the "suspect new spiral fracture" and ordered an x-ray of Plaintiff's right hip "today."  She also asked to see Mr. Selhime's chart "when [the] x-ray report is available."  As for Plaintiff's pain, Attachment 7 indicates

---

[10]Although the Amended Complaint alleges that Defendant Englund ignored Dr. Carlson's instructions, it appears to be undisputed that Mr. Selhime's leg was x-rayed within three weeks of his discharge from St. Thomas More Hospital, as contemplated by the Discharge Summary.

that Dr. Tiona increased Mr. Selhime's acetaminophen prescription from twice daily to three times daily. None of those facts suggest a medical provider who was deliberately indifferent to Mr. Selhime's condition.

Defendant Grieb apparently saw Mr. Selhime on March 19, 2012.  Although the Amended Complaint alleges that Defendant Grieb concluded Plaintiff did not have a "'true' emergency," Attachment 8 attributes that statement to Mr. Selhime.  It appears that Defendant Grieb examined Plaintiff's leg and noted that the surgical scars were "well healed."  Defendant Grieb also "suspected muscle atrophy."  More to the point, Defendant Grieb "encouraged" Mr. Selhime "to continue ambulating with assistance . . . to regain ambulatory ability, *as ordered by Dr. Tiona 3/12/12*."  *See* Attachment 8 (emphasis added).  Finally, Plaintiff's allegations involving Dr. Wienpahl and the corresponding medical records do not reflect deliberate indifference to his medical condition.   To the contrary, Defendant Wienpahl evaluated Plaintiff's condition, reviewed his medical history, changed Mr. Selhime's pain medication, and referred the patient to an outside orthopedic specialist for further evaluation.

In preparing this Recommendation, I am offering no opinions as to whether the Defendants could have done more to address Mr. Selhime's original fracture, either surgically or post-operatively, or whether a particular Defendant's actions were or were not negligent.  Mr. Selhime has not brought a claim for negligence against any Defendant.  I am simply finding that none of the actions described in the Amended Complaint or attributed to these Defendants rises to the level of deliberate indifference.  When I weigh Mr. Selhime's factual allegations together with the contemporaneous medical records attached to the Complaint and Amended Complaint, I find that Plaintiff's has failed to state a viable constitutional violation.  Even when viewed in a light most favorable to Plaintiff, the First Claim reflects a difference of opinion as to the proper course of treatment for Mr. Selhime's factures.  That will not suffice to survive a motion to dismiss.

C.      *Qualified Immunity*

Defendants raise the defense of qualified immunity to Mr. Selhime's claims.  Whether a defendant is entitled to qualified immunity is a legal question.  *Wilder v. Turner*, 490 F.3d 810, 813 (10th Cir. 2007).  "In resolving a motion to dismiss based on qualified immunity, a court must consider whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right, and whether the right at issue was clearly established at the time of defendant's alleged misconduct."  *Leverington v. City of Colorado Springs*, 643 F.3d 719, 732 (10th Cir. 2011) (internal quotation marks and citation omitted).  "[C]ourts have discretion to decide which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Id.*  "Qualified immunity is applicable unless" the plaintiff can satisfy both prongs of the inquiry.  *Herrera v. City of Albuquerque*, 589 F.3d 1064, 1070 (10th Cir. 2009) (internal quotation marks and citations omitted).

Based on the court's conclusion that Mr. Selhime has failed to properly allege a constitutional violation in Claim One, the court need not reach the "clearly established" prong of qualified immunity to conclude that dismissal is correctly granted in favor of the individual Defendants.  *See Wilder*, 490 F.3d at 815 (instructing district court on remand to enter judgment in favor of defendant on basis of qualified immunity, where plaintiff failed to carry his burden to show violation of a constitutional right).  Where no Eighth Amendment violation occurred, "the inquiry ends and the officer is entitled to qualified immunity."  *Id.* at 813.

D.      *Plaintiff's Conspiracy Claim*

The Amended Complaint appears to assert a "pendent" state law claim for conspiracy, but the scope of the Second Claim is less than clear.  The Second Claim broadly alleges that "[e]ven though CTCF infirmary knew about [his] new untreated break, they conspired amongst themselves to deny him treatment when he complained of pain."  As pled, the Second Claim only specifically refers to Defendants Walker, Tiona and Grieb, but then alludes to "other unknown doctors of CDOC" who "conspired together

to delay the treatment of Plaintiff even though he was in a great deal of pain."[11]  These allegations are not sufficient to state a viable conspiracy claim.

Mr. Selhime's failure to state an actionable Eighth Amendment claim is fatal to his Second Claim which alleges a conspiracy to violate that right. *Thompson v. City of Lawrence, Kansas*, 58 F.3d 1511, 1517 (10th Cir. 1995) ("In order to succeed on [a § 1983 conspiracy] claim," the plaintiff "must prove both the existence of a conspiracy and the deprivation of a constitutional right.  We have already determined, however, that [the plaintiff] has failed to establish the existence of any constitutional violations.  Since an essential element of the conspiracy claim is absent, the allegation fails.") (citation omitted).  *See also Jones v. Clinton*, 990 F. Supp. 657, 676 (E.D. Ark. 1998) ("absent an underlying violation of federal law, there can be no actionable claim alleging a . . . conspiracy to achieve that end").

Even if there were a valid Eighth Amendment claim as to one or more Defendants, Mr. Selhime's allegations are insufficient to state a conspiracy.  "[T]he rule is clear that allegations of conspiracy must provide some factual basis to support the existence of the elements of a conspiracy: agreement and concerted action." *Crabtree By and Through Crabtree v. Much more*, 904 F.2d 1475, 1481 (10th Cir. 1990).  *Cf. Snell v. Tunnel*, 920 F.2d 673, 702 (10th Cir.1990) ("The participants in the conspiracy must share the general conspiratorial objective . . . [to demonstrate the existence of a conspiratorial agreement it simply must be shown that there was a single plan, the essential nature and general scope of which [was] known] to each person who is to be held responsible for its consequences.") (internal quotation

---

[11]The Amended Complaint asserts that it is "impossible for Plaintiff to know" who in the Colorado Department of Corrections made the decisions "to conspire to give him inadequate medical treatment," but suggests this shortcoming can be cured through discovery.  *See* Amended Complaint, at 5.  However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" will "not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).  Faced with a challenge under Rule 12(b)(6), a plaintiff finds no refuge by arguing "that a claim just shy of a plausible entitlement to relief can, if groundless, be weeded out early in the discovery process through careful case management given the common lament that the success of judicial supervision in checking discovery abuse has been on the modest side." *Id.* at 685 (quoting *Bell Atlantic Corp.*, 550 U.S. at 559).

marks and citation omitted); *Durra v. Dempsey*, 869 F.2d 543, 545 (10th Cir. 1989) ("Because plaintiff failed to allege specific facts showing agreement and concerted action among defendants, the district court properly dismissed the conspiracy claim with prejudice.").  "[C]onspiracy can be shown by a sequence of events from which a reasonable jury could infer there was a meeting of the minds." *Merritt v. Hawk*, 153 F. Supp. 2d 1216, 1225 (D. Colo. 2001).  "However, conclusory allegations that defendants acted 'in concert,' or 'conspired' without specific factual allegations to support such assertions are insufficient."  *Id.* at 1225 (quoting *Aniniba v. City of Aurora*, 994 F. Supp. 1293, 1298 (D. Colo. 1998)).

Here, Mr. Selhime has not alleged any specific communication or command from which a conspiracy among the Defendants could be inferred.  *Cf. Twombly*, 550 U.S. at 557 (noting that "a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality," and "when allegations of parallel conduct are set out . . . they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action").  *See also American Dental Association v. Cigna Corporation*, 605 F.3d 1283, 1294 (11th Cir. 2010) (noting that "allegations of parallel conduct, accompanied by nothing more than a bare assertion of a conspiracy, do not plausibly suggest a conspiracy" and "fail to 'nudge . . . claims across the line from conceivable to plausible'").  Mr. Selhime's conclusory allegations are not sufficient to state a conspiracy claim against any of the Defendants.

E.      *Plaintiff's Request for Punitive Damages*

Punitive damages are available in a § 1983 action when "the defendant's conduct is shown to be motivated by evil motive or intent, or when if involves reckless or callous indifference to the federally protected rights of others."  *Smith v. Wade*, 461 U.S. 30, 56 (1983).  *See also Jolivet v. Deland*, 966 F.2d 573, 577 (10th Cir. 1992) (punitive damages "are to be awarded only when 'the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.' ") (quoting *Smith*, 461 U.S. at 56).  "Punitive damages become a

23

discretionary matter for the jury in a section 1983 action only if the plaintiff makes an adequate threshold showing." *Iacobucci v. Boulter*, 193 F.3d 14, 26–27 (1st Cir. 1999).

Other than a conclusory assertion that Defendants "showed deliberate indifference in the unnecessary and wanton infliction of pain," Mr. Selhime does not set forth any specific allegations that can support a claim for punitive damages. The fact that a defendant's actions may have been objectively unconstitutional is not considered when determining whether to award punitive damages. "Simple ignorance of the applicable legal rules, even arrogant ignorance, does not by itself indicate" the level of intent required to successfully plead a claim for punitive damages. *Lavicky v. Burnett*, 758 F.2d 468, 477 (10th Cir. 1985). "[A]n award of punitive damages requires an assessment of [the defendant's] subjective state of mind." *Wulf v. City of Wichita*, 883 F.2d 842, 867 (10th Cir. 1989). The allegations in the Amended Complaint, particularly when considered in conjunction with the corresponding medical records, do not support the requisite state of mind to support punitive damages.

## CONCLUSION

For the forgoing reasons, this court RECOMMENDS that:

1.      Defendant St. Thomas More Hospital's Fed. R. Civ. P. 12(b)(6) Motion to Dismiss (filed April 8, 2013) (Doc. # 32) be GRANTED and Defendant St. Thomas More Hospital be dismissed from this civil action.

2.      The Motion to Dismiss filed by Defendants Grieb, Wienphal, and Walker (filed May 6, 2013) (Doc. # 39) be GRANTED and Defendants Grieb, Wienpahl, and Walker be dismissed from this civil action.

3.      The Motion to Dismiss filed by Defendants Englund and Havens (filed June 17, 2013) (Doc. # 55) be GRANTED and Defendants Englund and Havens be dismissed from this civil action.

4.      The Motion to Dismiss filed by Defendant Carlson (filed July 11, 2013) (Doc. # 62) be GRANTED and Defendant Carlson be dismissed from this civil action.

5. The Motion to Dismiss Defendants Patterson and Tiona (filed July 16, 2013) (Doc. # 65) be GRANTED and Defendants Patterson and Tiona be dismissed from this civil action.

6. No Defendants or claims remaining, this civil action be dismissed in its entirety.


**Advisement to the Parties**

Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b);  *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995).  A general objection that does not put the District Court on notice of the basis for the objection will not preserve the objection for *de novo* review.  "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review."  *United States v. One Parcel of Real Property Known As 2121 East 30th Street, Tulsa, Oklahoma*, 73 F.3d 1057, 1060 (10th Cir. 1996).  Failure to make timely objections may bar *de novo* review by the District Judge of the Magistrate Judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge.  *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (District Court's decision to review a Magistrate Judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule");  *International Surplus Lines Insurance Co. v. Wyoming Coal Refining Systems, Inc*., 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the Magistrate Judge's order, cross-claimant had waived its right to appeal those portions of the ruling);  *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the Magistrate Judge's ruling).  *But see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).

DATED this 12th day of November, 2013.

BY THE COURT:


_s/ Craig B. Shaffer_____
United States Magistrate Judge